# EXHIBIT A

I am an officer of Thornapple Associates, Inc. ("Thornapple").  Thornapple provides expert assistance primarily in connection with investment-related disputes.  Thornapple has been retained on behalf of Sarasota County in the above-captioned action.  I am fully familiar with the facts of this case, all prior pleadings and proceedings.

I submit this expert report in opposition to defendants' motions to dismiss.  A list of the documents which I have reviewed is attached as Attachment A.

I earned an MBA at Harvard Business School, a Master in Public Administration (M.P.A.) at the John F. Kennedy School of Government, Harvard University, and completed Ph.D. studies and examination, but for the final dissertation and degree completion, in Government, Economics and Statistics at Harvard University, with cross-studies in support thereof at the Massachusetts Institute of Technology.

My experience in the securities industry spans 34 years and encompasses both the broker-dealer "sell side" of the securities industry as well as the investment management "buy side" of the industry.  As a registered representative of two brokerage firms, I provided institutional research and sales/trading coverage to a range of clientele, including banks, investment managers and hedge funds, foundations and self-directed pension and profit-sharing plans of corporations, states and municipalities. In addition to managing fully discretionary institutional Client investment portfolios on behalf of two brokerage firms, as Director, Options Management, for the Prudential Insurance Company of North America in both the bond and stock departments, I acted as a portfolio manager of both mutual funds and proprietary accounts, inaugurated the use of convertible securities, and established Prudential's stock lending program.

As President of Conner Capital Corporation, I acted as one of two portfolio managers with full discretion over multiple institutional Client portfolios, including the use of derivative hedging instruments, employing primarily equity securities in pursuit of after-tax investment objectives, and directly oversaw the firm's trading desk activities.

Over the last 28 years I have been individually involved in over 800 investment related disputes on behalf of Thornapple, of which over 150 have involved trusts and estates, and have testified on approximately 150 occasions in various arbitration forums, federal and state courts, as well as regulatory and disciplinary hearings. Disputes involved issues attendant to investment management, and the prudence, suitability, adequacy of risk disclosures and/or the exercise of due diligence by trustees, investment managers, accountants and other fiduciaries in connection with asset allocation, strategies or particular financial instruments in consideration of investment objectives and risk tolerances of the various entities and beneficiaries, and damage theory, methodology and calculation appropriate to such cases, including a number of Ponzi schemes. I have been retained by the Securities and Exchange Commission on approximately 12 occasions and on several large and complex investment matters by the Internal Revenue Service and various State-level Securities, Banking and Insurance Commissioners, as well as a wide range of investment management firms, broker-dealers, mutual and hedge funds, trustees, bankruptcy trustees, law firms, heirs and beneficiaries, as well as a wide range of both individual and institutional investors, investment advisors and hedge funds, both U.S. and foreign. My curriculum vitae is attached as Attachment B. My Rule 26 testimony log is attached as Attachment C.

This report concludes that Wachovia (Wells Fargo), in its fiduciary capacity as the investment manager of the securities lending investment program of Sarasota County (Sarasota), and with respect to the two investments at issue in this case, undertook greater risk than was consistent with Sarasota's primary investment objective of safety of principal while earning a positive spread to the rebate rate on securities lent. Wachovia also failed to satisfy Sarasota's secondary, but nonetheless important, investment objective of adequate daily liquidity.

Securities lending is both important to the efficient functioning of capital markets and also a highly efficient and relatively low risk method of generating incremental returns from otherwise idle assets. Securities lending is not normally associated with return volatility, or worse still, losses.

Securities lending is the market practice whereby securities are temporarily transferred from one party to another for a fee with the borrowing party providing securities or cash as collateral. One risk in cash collateral securities lending programs is that the instrument purchased with the borrower's cash falls significantly in value, pays a return lower than the rebate paid to the borrower or defaults. Other cash investment risks include yield curve and term mismatch risk. As with any financial product there is a risk-return relationship that must be clearly defined, understood and maintained.

The ancillary nature of a securities lending program requires that it not assume the risks and objectives of the underlying investment portfolios upon which its securities lending activities are based. The primary objective is not the attainment of return, or even of "incremental" return, but is instead the avoidance of loss. It is not intended to represent a leveraging of underlying assets, or any assumption of heightened risk of loss. It is instead to cautiously husband those assets already held in investment portfolios and to lend them for a modest consideration with the full assurance and expectation that whatever return may be attained, however modest, will always be

expected to be positive. Sarasota's collateral cash investment program is not in competition with the underlying investment returns and variability thereof of the investment portfolio from which the securities it lends were to be drawn.

The Revised County Guidelines specifically underscored the primacy of safety of principal among its investment objectives:

"Safety of capital is regarded as the highest priority in the handling of investments for Sarasota County. All other investment objectives are secondary to the safety of capital. Each investment transaction shall seek to first ensure that capital losses are avoided, whether they be from securities defaults or erosion of market value."[1]

The agreement between Sarasota and Wachovia provided for Wachovia to earn a fee equal to 40% of the net securities lending revenues generated. This was changed to 30% of the net securities lending revenue generated on 2/22/08.[2] From the standpoint of risk-adjusted investment performance , it was inefficient for Sarasota to receive only 60% of the risk premium and 100% of any losses that could arise from the risk undertaken since Sarasota is, thereby, inherently unable to earn a market risk-adjusted return. The only justification for a hefty 40% fee being paid to Wachovia for managing Sarasota's securities lending investment program would be for the source of the alpha to come from Wachovia's ability to locate borrowers of Sarasota's securities who are willing to pay a risk-adjusted premium to effectuate the transaction, in the form of receiving a below market interest rate on their cash posted as collateral.

As an example, assume the market interest rate on risk-free investments is 3%. Wachovia is able to locate borrowers for Sarasota's investment portfolio who will post cash collateral and earn a 2.75% rebate rate on that cash collateral. Sarasota can then

---

[1] Sarasota County Investment Policies, p. 4.
[2] E-mail dated 2/22/08, Lynn Thompson to Jeff Kern  (WACH-SARA 0010384)

reinvest the money, at the risk-free rate, and earn the 0.25% spread. Since the source of the profit is generated from Wachovia's ability to locate borrowers willing to accept a below market interest rate, Wachovia earns 40% of the 0.25% spread, or 0.10%. Alternatively, suppose Wachovia were to lend Sarasota's securities out at 3%, and reinvest the cash collateral at 3.25%. In this instance, the 0.25% spread does not come from Wachovia's ability to find a borrower willing to earn a below-market rebate rate, but from Sarasota's assumption of increased market risk for which the proper market risk adjusted return is 3.25%, or 0.25% greater. For Wachovia to be paid 40% of Sarasota's 0.25% market risk premium, Sarasota must be undercompensated by 40% of the 0.25% risk premium assigned by the marketplace. Hence, in such a fee arrangement, Sarasota can never be adequately compensated for the market risk to which its securities lending investment portfolio is subjected. A fee arrangement paying Wachovia a percentage of profits can only a be justified where Wachovia generates the alpha from its borrowing abilities, not from Sarasota's acceptance of less than full risk-adjusted premium for bearing 100% of any market risk taken.

The typical safety of securities lending programs is discussed below in the Bank Holding Company Supervision Manual, December, 1998, Section 2140.0.1 Securities Lending

> "Securities lending is conducted through open-ended "loan" agreements, which may be terminated on short notice by the lender or borrower. Repurchase agreements are generally used by owners of securities as financing vehicles and in certain respects, are closely analogous to securities lending. <u>The objective of securities lending, however, is to receive a safe return in addition to the normal interest or dividend</u>." [emphasis added]

Hedge funds typically charge a 20% performance fee (half the rate in this matter). Sarasota didn't sign up for a hedge fund. Such hedge fund fee structures are designed to compensate managers for their expertise in locating mispriced assets. In Sarasota's investment lending program Wachovia was not being compensated for locating mispriced assets, but for locating borrowers willing to provide cash collateral for a

below-market return, allowing Sarasota to earn a "spread" that does not stem from market risk.   Sarasota would be fully justified in compensating Wachovia for its performance in finding such borrowers by paying a percentage of the  profit to Wachovia (e.g. 40%) and retain the remainder as an incremental return to its overall underlying portfolio of securities without having undertaken additional market risks. The following two investments at issue in this case should not have been in the cash reinvestment portfolio of such a program:

1)    Altius III Funding, Ltd.
2)    Lehman Brothers Inc. floating rate notes.


<u>Altius III Funding, Ltd</u> (Altius)


Definitions


The following are defined terms in the Altius Offering Circular dated February 22, 2007:

"Asset Backed Securities" or "ABS Securities" means ABS Student Loan securities, ABS Auto Dealer Floor Plan Securities and ABS Credit Card Securities. [3]

"Residential Mortgage-Backed Securities" or "RMBS" means securities that represent interests in pools of residential mortgage loans secured b 1 to 4 family residential mortgage loans and shall include, without limitation, RMBS Prime Mortgage Securities, RMBS Alt-A Mortgage Securities, RMBS subprime Mortgage Securities and RMBS Bespoke Synthetic Repackaging Securities.[4]

"Reference Obligation" means a RMBS or Asset-Backed Security upon which a Synthetic Security is based and that satisfies the criteria set forth in the definition of Synthetic Security.[5]

"Synthetic Security" means the credit default swaps entered into by the Issuer and Goldman Sachs International on the Closing Date, evidenced by an ISDA Master Agreement (Multicurrency Cross Border) and one or more confirmations.[6]

---

[3] p. A-2.
[4] p. A-10.
[5] p. A-10.
[6] p. a-12

The ABS definition does <u>not</u> include mortgage backed securities and instead ABS is restricted to shorter term collateral, such as credit cards and auto loans.

Additional Definitions as used within this report:

Collateralized Debt Obligation (CDO):  a security backed by a managed diversified pool of debt obligations.

Cash CDO:  a CDO which directly owns the collateral assets.  This type of CDO is sometimes referred to as an "ABS CDO".

Synthetic CDO – a CDO which does not directly own the collateral assets, but replicates their economic risks through the use of credit default swaps.

Expected maturity – the date on which a structured finance security will be paid in full, taking into account an expected prepayment/default schedule.  The actual maturity may prove to be sooner or later than expected, depending on whether principal payments occur faster or slower than expected, upon which the actual performance of the collateral, and the actual occurrence of its maturity, depend.  If a bond or a tranche was scheduled to receive half of its principal in 6 months, and the other half of its principal in 18 months, based upon forecasted prepayments/defaults, the expected maturity would be 18 months.

Stated maturity – the last date on which a security will be paid in full, regardless of prepayments.  With prepayments, the security may be repaid significantly prior to the stated maturity.  A bond may have a stated maturity of 20 years, while also having an expected maturity of

just 18 months, based upon an expectation of more rapid prepayments/defaults.

Weighted Average Life (WAL) sometimes referred to as expected average life (EAL), is the average time to receipt of expected principal payments. If a bond or a tranche was scheduled to receive half of its principal in 6 months, and the other half of its principal in 18 months based on forecasted prepayments/defaults, the WAL would be 12 months. Note the WAL is less than the expected maturity.

## Inadequacy of Security Lending Investment Guidelines

In drafting Sarasota's written investment guidelines, Wachovia had an affirmative fiduciary duty to become fully informed of the investment objectives and risk tolerances of Sarasota. As found in the Custody Services Comptroller's Handbook January 2002, authored by the Comptroller of the Currency, Administrator of National Banks, the investment objectives and risk tolerances for a securities lending program are described as follows:

> "One of the primary risks a national bank faces in securities lending is managing cash collateral. The investment of cash collateral is the primary source of revenue from securities lending activities. The return in excess of the borrower rebate is split between the agent bank (or investment manager) and the lending account. Because of the fee-sharing arrangement, a bank may have an incentive to accept higher risk in managing cash collateral. To control this risk, cash collateral should be invested pursuant to written investment guidelines.
>
> The bank should have a written investment policy addressing management of cash collateral. The policy should establish minimum investment guidelines including permissible types of securities, minimum credit quality standards, maturity and duration limits, maturity mismatches, and liquidity requirements."

As seen from the Comptroller's Handbook, Sarasota's guideline on ABS, apparently written by Wachovia, was inadequate to determine the appropriate level of risk of the investment in order to ensure that Sarasota's portfolio was managed in accordance with the risk parameters attendant to their investment objectives, of which safety of capital was primary. An example of the incomplete information in the Securities Lending Investment Guideline, is section L:

"L. Asset-backed securities having a minimum rating, at the time of purchase, or at least A-1+ by S&P or P-1 by Moody's or F-1 by Fitch if the final maturity is 13 months or less AAA by S&P or Aaa by Moody's or AAA by Fitch for longer maturities. Such minimum ratings shall exist by at least two of the three NRSO's."[7]

This section fails to even specify a maturity limit for these assets. Apparently this problem was recognized when, on March 31, 2006, in a letter to amend the securities lending investment guidelines dated January 10th, 2006, the guideline of L is modified:

"L. **Asset Backed Securities – Maturity Limit 3 year Expected Final** Asset-backed securities having a minimum rating, at the time of purchase of at least A-1+ by S&P or P-1 by Moody's or F-1 by Fitch if the final maturity is 13 months or less AAA by S&P or Aaa by Moody's or AAA by Fitch for longer maturities. Such minimum ratings shall exist by at least two of the three NRSO's."[8]

Note however that only the maturity of the ABS was addressed, and another important parameter of the program, maturity mismatch, remained unaddressed. In fact, Wachovia's securities lending guidelines never incorporate specific maturity mismatch limitations, and, in the absence of such guidelines, Wachovia thereafter failed to adopt or adhere to such limitations that would be essential to managing such a securities

---

[7] Securities Lending Investment Guidelines, Attachment "B"
[8] Securities Lending Investment Guidelines, Attachment "B"

lending investment program in a manner consistent with Sarasota's stated primary investment objective of safety of capital.

Evidence that MBS was never intended in ABS

As evidence that MBS was never intended in ABS consider what occurs if you permit MBS in ABS. In the Securities Lending Investment Guidelines, MBS is in Section D, has a maturity limit of 25 months and is restricted to government agency backed MBS. The investments in section L, which are restricted to ABS, short-term collateral, have a longer maturity limit of 3 years. Note that this is not inconsistent since, as short-term collateral, ABS has inherently less potential extension risk than 30-year MBS. If, you mistakenly permit non-agency backed MBS in the ABS category, the anomalous result is to permit uninsured (non-agency backed) mortgages with more extension risk than would be permitted for government guaranteed mortgages – thereby allowing more extension risk in the riskier collateral and less extension risk in the safer collateral, an outcome that would be contrary to prudent risk management guidelines and the primary objective of safety of capital.

**'Section D:  Specific obligations of the following – Maturity Limit:  25 months**:

Federal Farm Credit Banks (FFCB)
Federal Home Loan Mortgage Corporation (FHLMC)
Participation certificates of debentures
Federal Home Loan Bank (FHLB) or its banks
Government national Mortgage Association (GNMA)
Government guaranteed:
Federal National Mortgage Association (FNMA)
Student Loan Marketing Association (SLMA)
Tennessee Valley Authority (TVA)
Resolution Funding Corporation (REFORCOP)
Financing Corporation (FICO)

Permitted investments in the above listed agencies and instrumentalities shall include bonds, debentures, notes or other evidence of indebtedness issued including mortgage pass-throughs, collateralized mortgage obligations, adjustable rate securities, and adjustable rate mortgages."

The differences between section D in the original document and section L in the amended document are twofold:

1) Government guaranteed mortgages, pass-throughs and CMOs are <u>less risky</u> than credit-exposed AAA rated mortgages that Wachovia interprets as being included in the "ABS" of section L. Yet the less risky government insured mortgages have a maturity limit of 25 months, and the riskier credit exposed mortgage backed securities have a 3-year limit. In consequence, Wachovia has allowed itself essentially an extra year of maturity in the riskier asset class if their inappropriate inclusion of MBS as falling within ABS is permitted.

2) The maturity wording provided to Sarasota County has also subtly been changed.

   a. In Section D, the wording is "Maturity Limit 25 months".
   b. In revised Section L the wording is "Maturity Limit 3 year Expected Final".

Note that in addition to changing the limit from 25 months to 3 years, the words "Expected Final" have been added. These two little words have major ramification. The entire meaning of "maturity" has been altered in a manner that permits much more risky investments. Previously the maturity was a "hard" maturity. The investment had to be paid back within 25 months, with no allowance for prepayment extensions. Now, with "expected final" maturity, the 3- year limit only has to be met under some assumed prepayment behavior. If prepayments don't occur as fast as the forecasted prepayments in the modeling assumptions, the actual maturity may extend – and since Wachovia is including 30-year credit exposed mortgages, in their definition of ABS, the extension can be massive.

As an example, consider a tranche of credit exposed mortgages that has a stated maturity of 30 years. However, if there are considerable prepayments, and these prepayments are currently anticipated by the marketplace, then the expected maturity, given these expected level of prepayments, is two years. This tranche, not permitted in Section D, would be permissible according to the revised definition in Section L. However, if significant defaults occur, or the expected prepayments didn't materialize, the investment might have an actual maturity of 30 years, or completely default. Compare this with the government agency backed mortgages that have an actual maturity (not expected maturity) of two years. In the worst case, the tranche is paid in two years, either by mortgage principal or government agency guarantee. Permitting the purchase of assets with decades of extension risk and with non-government agency backed collateral, is massively more risky than the Section D mortgages of two years maximum maturity and an agency guarantee and is clearly contrary to the stated primary objective of safety of capital.

The Altius Purchase

The Altius investment was purchased on September 8, 2006 as an "as of trade" on September 28, 2006.[9]

CDOs Not Listed in the Securities Lending Investment Guidelines

Altius is a CDO. A CDO is not listed as a permissible investment under the investment guidelines.

Florida statute 218.415 mandates that for local government investment policies:

---

[9] Exhibit F

"(5) LISTINGS OF AUTHORIZED INVESTMENTS – The investment policy shall list investments authorized by the governing body of the unit of local government, subject to the provisions of subsection (16). Investments not listed in the investment policy are prohibited. If the policy authorizes investments in derivative products, the policy must require that the unit of local government's officials responsible for making investment decisions or chief financial officer have developed sufficient understanding of the derivative products and have the expertise to manage them. For purposes of this subsection, a "derivative" is defined as a financial instrument the value of which depends on, or is derived from, the value of one or more underlying assets or index or asset values."

Consequently, CDOs, which were not listed in the investments, were prohibited investments and were not allowed to be purchased for Sarasota.

Altius is not an "ABS CDO"

Wachovia incorrectly portrays the investment as an "ABS CDO". Sarasota was permitted to invest in asset backed securities (ABS) where ABS is a noun. The ABS in "ABS CDO" is an adjective. As an adjective it is used to describe that the underlying assets owned by the CDO are ABS.

The alternative to an "ABS CDO" is a "synthetic CDO" where the CDO does not own the underlying ABS assets but instead, through the use of credit default swaps, secures an entitlement to the economic risks and characteristics of the ABS assets. Consequently, an "ABS CDO" is NOT ABS, but is instead a subset of CDOs. This point becomes moot in the case of Altius because this particular investment is NOT an ABS CDO. In the Offering Circular it clearly states that some of the collateral is synthetic.[10] Consequently, keeping in mind the Florida Statute 218.415 listing of authorized investments, nowhere in the

---

[10] Depo. Exhibit 195, p. 41 under the Section "Synthetic Securities"

guidelines is the county permitted to invest in credit default swaps or other synthetic investments, making the otherwise noncompliant Altius CDO investment further non-compliant because it is not an "ABS CDO".

## The Maturity of Altius

Despite the fact that Altius is a synthetic CDO, Wachovia purchased the A-1-a tranche on behalf of Sarasota on September 28, 2006. Inappropriately using Section L of the guidelines the investment was required to have a "Maturity Limit 3 year Expected Final". However, nowhere in discovery is there evidence that the synthetic Altius CDO investment met even that reduced requirement. The only due diligence documents for Altius produced in discovery are debt marketing materials dated August, 2006. These materials represent that the A-1-a tranche had an <u>Expected WAL</u> of 0.8 years. Critically, nowhere in these marketing materials is the <u>Expected Maturity</u> of the tranche disclosed (recall the expected maturity might be significantly greater than the WAL). By reference to the Offering Circular we find that the A-1 tranche has an expected maturity of December 2, 2014 (more than 8 years) The only discovery documents in evidence indicate that the synthetic Altius CDO exceeded the maturity limit of "3 year expected final" investment guideline is further evidence that the Altius CDO was not a permitted investment for Sarasota.

## Inadequate Due Diligence with respect to the Altius Investment

The risk profile information for the A-1-a tranche provided in the marketing materials sent by Goldman Sachs for the synthetic Altius CDO is inadequate to determine the risk of the investment. First, only a single WAL is given for the A-1-a tranche. Nowhere in the marketing material can one find what assumptions underlie this analysis, nor are the results of changing prepayments and/or defaults on the principal repayments of the A-1-a tranche considered. The synthetic Altius CDO collateral included in its portfolio of

assets: commercial mortgage backed securities, prime residential mortgage backed securities, mid-prime residential mortgage backed securities, sub-prime residential mortgage backed securities, student loans, credit card receivables, and auto leases[11], each of which required separate default and prepayment modeling assumptions due to the different characteristics of the collateral components.

Specifically no disclosure is made in the Goldman Sachs marketing materials relied upon by Wachovia that the sequential payment priority of the A-1-a tranche over the A-1-b tranche can suddenly change to a pro-rata allocation across the combined A-1-a and A-1-b tranches. No separate due diligence by Wachovia beyond the Goldman Sachs marketing materials is evident as detailed below.

Altius when marketed to Wachovia's by Goldman Sachs, was brought to the attention of Kevin O'Connor, the head of the trading desk at the time, who sought the required approval from the investment committee to authorize its purchase. Although O'Connor testified that the steps taken to satisfy himself as to the credit quality of the investment included a review of the structure of the transaction, the subordination that was protecting the A-1-a tranche, to include the subordination of other tranches to take first losses as opposed to the A-1-a tranche. However, O'Connor believes that he looked solely at the Goldman Sachs marketing material in making that assessment. And we know that the Goldman Sachs marketing materials do not disclose the material risk that the A-1-a tranche could be demoted to a dramatically reduced pro rata payment plan alongside the substantially larger A-1-b tranche. O'Connor further testified that neither Bloomberg nor Intex, although customary tools used by Wachovia, were used to try to make such calculations.[12]

---

[11] Exhibit 195, pp. 72-81 under the Section "The Collateral Assets"
[12] Deposition of Kevin O'Connor, pp. 42-46

Although O'Connor testified that "the performance of the underlying securities was not what [he] expected it to be," when asked whether the Altius investment was structured in a way different than what he had first thought at the time of purchase, Kevin O'Connor further testified, "Not to my knowledge."[13]

O'Connor, although the principal decision-maker involved in the purchase of the Altius investment, according to his testimony, had no knowledge that the A-1-a tranche could be stripped of its senior sequential payment priority and placed at an acute disadvantage of being paid pro rata on a substantially diluted basis alongside the much larger A-1-b tranche. Consequently, the due diligence in understanding the cash flows of the Altius III A-1-a tranche by Wachovia upon the purchase of the tranche for Sarasota County as evidenced by the discovery material was confined to the Goldman Sachs marketing material, and was inadequate to determine the actual risk of the investment which, in fact, materialized by November 2007 when the payment of the A-1-a tranche went from senior to pro-rata with respect to the much larger A-1-b tranche.

Altius is a Private Placement

As stated on the cover sheet of the Offering Circular, the synthetic Altius CDO was to be offered to qualified institutional buyers ("QIB"), as defined in Rule 144A under the United States Securities Act of 1933. Sarasota County is not a qualified institutional buyer and consequently is not permitted to purchase Altius. Apart from the QIB issue, private placement 144A investments are not listed in the investment guidelines of Sarasota County and, according to Florida Statute 218.415, "investments not listed in the investment policy are prohibited."

The market for securities purchased via private placements is less liquid than publicly traded securities. In the Offering Circular under RISK FACTORS, the very first risk listed is

---

[13] Deposition of Kevin O'Connor, pp. 53-54

*Limited liquidity and Restrictions on Transfer.*  There is
currently no market for the Securities.  Although each
Initial Purchases has advised the Issuers that it intends to
make a market in the Offered Securities, the Initial
Purchasers are not obligated to do so, and any such
market making with respect to the Offered Securities, may
be discontinued at any time without notice.  There can be
no assurance that any secondary market for any of the
Notes will develop or, if a secondary market does develop,
that it will provide the Holders of the Notes with the
liquidity of investment or that it will continue for the life of
such Notes and consequently a purchaser must be
prepared to hold the Notes until maturity.  Consequently,
a purchaser must be prepared to hold the Notes for an
indefinite period of time or until State Maturity.[14]

The Offering Circular warns that investors should be prepared to hold the investment until the stated maturity, which appears on the cover page: "Notes Due 2041," a 35-year period as of the September 2006 purchase date that was clearly inappropriate for Sarasota.

A hallmark of private placement investments is limited access to information, including pricing information.  Interactive Data Corp (IDC), a leader in fixed income valuations, that prices most of the ABS portfolio, does not price the Altius investment, requiring Altius to be marked internally by Wachovia on its monthly statements to Sarasota in contravention of Sarasota's investment policy:

"Market Value  In determining market value, dealers' bid
prices shall be used, as quoted daily in the Wall Street
Journal, or other acceptable media, and accrued interest
shall be included."[15]

---

[14] Depo. Exhibit 195, p 31.
[15] Sarasota County Investment Policy, p 9.

Deterioration of the Altius Investment

A careful reading of the Offering Circular shows that, provided monthly overcollateralization tests were met, the A-1-a tranche would receive principal payments sequentially ahead of the A-1-b tranche.  However, in the event that Altius fails the overcollateralization test, then the A-1-a tranche would be paid the ensuing monthly principal payment on a pro-rata basis alongside the A-1-b tranche.  The consequence of this to the A-1-a tranche would be that its EAL would extend from 0.8 year to 5.6 years, without taking into account the effects of the deteriorating principal payments that trigger a change in the payment priority between the A-1-a and the A-1-b tranches, with dramatically diminished cash flow to the A-1-a tranche.

According to the Trustee information as reported on Intex, the synthetic Altius CDO failed an overcollateralization test that was reported on November 26, 2007.  This failure was a trigger that stripped the A-1-a tranche of the key senior sequential pay characteristic upon which its represented EAL of 0.8 years at the time of Wachovia's purchase decision had depended.  In stark contrast to its preferred sequential payment position to the A-1-b tranche, the A-1-a tranche was demoted to pro rata payment alongside the far larger A-1-b tranche, which had the effect of severely reducing the amount of principal payments received by the A-1-a tranche to a *de minimus* amount, thereby extending its expected maturity, possibly by decades.  The failure of Wachovia to properly understand the A-1-a tranche at the time of purchase significantly affected the performance of the investment when the cash flows materially changed on November 26, 2007.  However, Wachovia continued to mislead Sarasota about the true nature and impaired performance of the investment.

Chart 1



Chart 2: Principal paid to the Altius A-1-a and A-1-b tranches over time



Despite the fact that the cash flows of the synthetic Altius CDO had collapsed, Wachovia does not inform Sarasota of the true long-term nature of the tranche. On January 3, 2008 Wachovia tells Sarasota "While these prepayments have been slower than expected, we believe they will continue to pay down and ultimately pay off in full..."[16] Having priced the synthetic Altius CDO at 99 cents on the dollar as of year-end 2007, Wachovia does not seem to realize the massive deterioration in the investment and consequently does not give Sarasota a revised estimate to Wachovia's expected maturity of the investment – or the possibility that the investment might default altogether. Consequently, in addition to assigning an unrealistic mark to the synthetic Altius CDO, Wachovia has failed to inform Sarasota of the now extraordinary long-term nature of this investment, or its heightened risk at this time.

---

[16] Depo. Exhibit 92

Wachovia realizes the gravity of the situation sometime in January 2008.

| Month End | Current Face | Current Market Value | Mark |
|---|---|---|---|
| Jan-07 | 16,949,038.00 | 16,949,038.00 | 100.00000 |
| Feb-07 | 15,949,239.18 | 15,949,239.18 | 100.00000 |
| Mar-07 | 15,170,677.62 | 15,170,677.62 | 100.00000 |
| Apr-07 | 14,341,653.12 | 14,341,653.12 | 100.00000 |
| May-07 | 13,130,928.98 | 13,130,928.98 | 100.00000 |
| Jun-07 | 11,991,593.64 | 11,991,593.64 | 100.00000 |
| Jul-07 | 10,899,933.06 | 10,898,655.72 | 99.98828 |
| Aug-07 | 10,297,156.99 | 10,295,950.29 | 99.98828 |
| Sep-07 | 9,852,813.70 | 9,851,659.07 | 99.98828 |
| Oct-07 | 9,164,570.56 | 9,118,747.71 | 99.50000 |
| Nov-07 | 9,005,277.76 | 8,960,251.37 | 99.50000 |
| Dec-07 | 8,987,627.33 | 8,897,751.05 | 99.00000 |
| Jan-08 | 8,978,155.22 | 3,591,262.09 | 40.00000[17] |

On January 31, 2008, the day after S&P places Altius on negative credit watch, Wachovia's discloses to Sarasota of the dramatic decline in both the cash flow and the market value of the A-1-a tranche in the monthly statement, when Wachovia marks down the synthetic Altius CDO by 60% to 40 cents on the dollar.

On February 12, 2008, over 2 months after the synthetic Altius CDO first failed the overcollateralization test in November 2007, Wachovia discloses to Sarasota the resulting change from a sequential to pro rata payment structure. "Altius was expected

---

[17] Sarasota County Security Lending Statements

to be paid off in less than 4 months, however, this seems unlikely now given that the payment structure has been changed from sequential to pro-rata...we have marked the asset to a conservative price of 40." [18]

Considering that the Altius investment was marked by Wachovia, it is simply not credible to believe that Wachovia's good faith pricing effort suddenly and "conservatively" valued at 40 as of the end of January what Wachovia had priced at 99.5 as of November month-end and 99 as of December 2007 month-end. Wachovia's assertion that up to that time the A-1-a tranche had still been "expected to be paid off in less than 4 months" discloses the degree of their uninformed ignorance of the debilitating shift in the payment plan for the A-1-a tranche from sequential to pro rata with the A-1-b tranche, that was triggered on November 26, 2007. Wachovia's ignorance credibly accounts for the misreported 2007 year-end par value of the A-1-a tranche to Sarasota. Given the opportunity to correct their error as of February 12th, and to admit that they never performed the due diligence required of them as a fiduciary, relying instead only on inadequate marketing materials provided by Goldman Sachs, and that they failed to monitor, much less re-model, the investment, taking into account diminishing principal payments by November 2007, Wachovia chose not to "fess up", but to instead further deceive Sarasota by suggesting that the payoff in 4 months that Wachovia had expected "seems unlikely now" and warrants a "conservative price of 40" by Wachovia's internal pricing. Wachovia, rather than disclose that it had neither understood the investment, nor admit that it had failed to monitor the investment during subsequent months, and had consequently mispriced the A-1-a tranche as of year-end, instead characterized their reassessment of the expected maturity and the market price of the A-1-a tranche as a recent decision in February, "now", rather than a misreporting to Sarasota since November 2007.

---

[18] Depo. Exhibit 51

Disclosure of Downgrade

On March 25, 2008 S&P downgraded the Altius investment to BBB. The Securities Lending Investment Guidelines require "A downgrade in credit rating does not by itself require immediate liquidation of the security, but does require prompt review by the Lender regarding the appropriateness of holding the security if the time to maturity exceeds seven days. The Lender will be notified promptly by Agent of such downgrade and asked for specific written instructions as to the possible disposition of that security, provided the maturity of the downgraded security exceeds 7 days."

On March 31, 2008 in an internal email discussing Altius "This is the one we missed."[19]

On April 1, 2008, Wachovia emails Sarasota, "I wanted to let you know that S&P has downgraded Altius 2006-3A A1A CUSIP 02149AA1 to BBB last week, citing continued credit deterioration in the underlying assets."[20]Having spoken on this day with Jeff Kern, Lynn Thompson e-mails internally to "All" that "he was thrilled to hear that Kevin O would be purchasing his share of Altius at par."[21]

On May 7, 2008 in an internal email Wachovia writes: "with the exception of Altius, we think holdings are in good shape".[22]

On May 14, 2008 in an email to Sarasota, Wachovia writes: "Due to the slow-down of the payments, the expected maturity is currently 12/2/2009 for this asset."

---

[19] Depo. Exhibit 161.
[20] Depo. Exhibit 162.
[21] Depo. Exhibit 129.
[22] Depo. Exhibit 60.

There is no documentation in discovery to support this 12/2/09 expected maturity date, yet it was conveyed to Sarasota by Wachovia as an informed investment opinion. Approximately $98 million in principal needs to be repaid in approximately 20 months, or approximately $5 million /month of necessary principal payments to retire the tranche. The A-1-a tranche hasn't received more than $407,000 in any month since it was demoted to pro-rata payment allocation with the much larger A-1-b tranche. Internally,[23] on May 7th, Wachovia acknowledges the tranche is not in good shape. This is not conveyed to the client who is told a week later, on May 14, that the A-1-a tranche has an expected maturity of December 2, 2009, indicating that Wachovia expects that it will be paid in full in 20 months.[24]

In Conclusion, the Altius investment was not compliant with the investment guidelines of Sarasota County. Including:

1) Altius is a CDO, and CDOs are not listed as permitted investments.
2) The clause Wachovia is using to justify an investment in credit exposed MBS, like Altius, permits significantly longer maturities than the permitted maturities for non-credit exposed MBS – illustrating that the ABS clause was intended for shorter maturity collateral without significant extension risk.
3) The Altius CDO has synthetic collateral using credit default swaps. Synthetic investments are not listed as permitted investments in the investment guidelines.
4) The synthetic Altius CDO is a 144a private placement. Sarasota is not a QIB and was not legally permitted to purchase the investment.
5) Even if Sarasota was a qualified QIB, private placements are not in the investment guidelines as permitted investments.

---

[23] Depo. Exhibit 60.

[24] Depo. Exhibit 202. Wachovia advises Sarasota that the A-1-a tranche has an expected maturity of 20 months rather than a 20 <u>year</u> maturity at the $400,000 principal payment rate.

6) The 144A nature of the Altius CDO reduced its liquidity and contributed to pricing services being unable to price the investment, in violation of the Sarasota's requirements.

7) The offering circular indicates the synthetic Altius CDO had an expected final maturity of over 8 years, nearly triple the permitted expected maturity, had Altius been a permitted ABS. No other discovery documents dispute this figure.

8) According to the due diligence received in discovery, Wachovia viewed a single WAL when purchasing this tranche, without any information on the assumptions underlying the analysis or how the WAL would change with changes to the prepayment/default assumptions.

9) Sarasota was not informed of the "changing" structure of Altius from sequential to pro-rata until nearly 3 months after the structure had changed, a time period where Wachovia marked the position just under par.

10) In May 2008, five months after the change to a pro rata payment plan occurred, Sarasota was advised by Wachovia that they could expect final payment in 20 months, while internal documents reflect that Wachovia was aware the investment was not in "good shape".

11)

<u>The Lehman Brothers Note</u>

The purchase of $40 million of Lehman Brothers Notes on March 20, 2007 was notably inconsistent with the investment objectives and risk aversions of Sarasota, and violated guidelines governing Wachovia's discretionary investment management of the Sarasota account. Consequently, Wachovia, in exercising the investment discretion delegated to it by Sarasota, was negligent in performing its fiduciary duties to Sarasota.

The backdrop against which Wachovia's decision to invest in the Lehman Notes must be viewed are the stated objectives of the portfolio that Sarasota gave to Wachovia in the Securities Lending Investment Guidelines.

"The primary objective is to provide safety of principal while earning a positive spread to the rebate rate on securities lent.  The second objective is to provide adequate daily liquidity for the collateral portfolio, and the third objective is to obtain the highest yield possible within the parameters of these guidelines."

Notable is the fact that the primary objective was safety of principal.  It was not to seek the highest return possible subject to the investment guidelines being met.  In fact, the primacy of safety of principal as an objective is distinctively stressed.  It is not one among a number of equally ranked objectives.  Safety of principal is foremost, to which the pursuit of any return on investment must be subordinated.

While acknowledging that the Lehman Brothers investment did conform to a number of the investment guideline requirements, fiduciary duty on the part of an investment manager extends beyond the mere observance of guidelines, and must always take into account the prudence of any investment decision, and to do so in the context of market conditions.  Where, as in the case of Sarasota, the very safety of capital is specified as the foremost objective, any uncertainty as to the degree of risk being assumed is consistently decided in favor of safety over profit and the assumption of any risk in its pursuit.  Unlike pension funds that seek to assume market risk and its attendant volatility, including the risk of loss, in pursuit of statistically "favorable" risk-adjusted returns,   Sarasota's cash collateral investment objectives were decidedly and unambiguously minimalist:   first and foremost the assurance of safety of principal to which the attainment of any profit is subordinated.

Provisions of the Investment Guidelines met by the Lehman Notes

As of purchase date, March 20, 2007:

- The Lehman Brothers Note was "A" rated, satisfying guideline requirements.
- The March 23, 2009 maturity of the Lehman Brothers note fell within the 25 month maturity limit established in the letter agreement to amend the securities lending agency agreement.
- The $40 million amount of the investment in the Lehman Brothers Note was within the $50 million diversification requirement established within the investment guidelines.

Consequently, Sarasota's claim to rescind the $40 million Lehman investment is because it violated provisions within the investment guidelines other than the three listed above. The investment guidelines represented the universe of acceptable investments. Wachovia's responsibilities, as a fiduciary under the agreement, however, extended beyond selecting approved investments, but entering into investments in the course of managing a portfolio that was best suited to achieving Sarasota's primary goal of safety of principal, while also attaining a positive return. The Lehman note purchase violated other provisions of the investment guidelines as detailed below.

Violated the guidelines on the date of purchase

Despite having many characteristics of a permitted investment according to the investment guidelines, the Lehman bond still did not qualify as a permitted investment on March 20, 2007, the date on which Wachovia purchased it for Sarasota's portfolio. Specifically, Section B.2 states the following:

> **B. Liquidity** 2. Weighted average duration mismatch between loans and collateral investments shall not exceed one (1) day. For the purpose of calculating interest rate mismatch risk and the calculation of weighted average maturity or duration, the maturity date on floating rate securities shall be deemed to be the next interest rate reset date…"

This section placed substantial restrictions on Wachovia in managing the securities lending program.  Essentially, every loan was going to have to be matched to a specific asset, leading to exceptional oversight and coordination with the composition of the both the lending and cash portfolios.

According to deposition testimony of Kevin O'Connor, while there was no reference in the Sarasota securities lending investment guidelines to a maximum term for a loan transaction, Wachovia would attempt to match the term loan with either term or maturity of a given investment or to the next [interest] reset date of a given investment. Absent specific reference in the guidelines, Wachovia would consider the maximum term of a loan to be consistent with the maximum term of the investment.[25]

With full understanding that Sarasota had written guidelines on how to invest cash collateral, and was relying on Wachovia to abide by those guidelines[26], O'Connor described a classic "matched" program designed to eliminated interest rate risk by "managing the gap," the degree to which paired maturities of lent securities and the investment horizon with which the attendant cash collateral can be managed down to no more than a one day difference, or "mismatch."  Such is the conservative assumption of risk that more than a single day's "mismatched" exposure would not be acceptable in consideration of the importance of safety of capital and nominal incremental returns.

The Lehman Brothers Note reset daily with respect to its interest rate, keying off the fed funds "open rate."   As such, the duration over which any rate of interest would be assuredly earned, was one day.  Beyond that day, the rate could change, up or down. Hence duration was very short, while the maturity of the underlying Note, even as in the Lehman Brothers Note, was a separate measure, unmodified by the daily reset feature.

---

[25] Deposition, Kevin O'Connor, pp. 27-28
[26] Deposition, Kevin O'Connor, p. 193

Using the data in the monthly portfolios Sarasota was provided in discovery, the following weighted averages were calculated.

| End of Month | Duration Assets | Duration Loans |
|---|---|---|
| February, 2007 | 19 Days | 31 Days |
| March, 2007 | 14 Days | 25 Days |

The $40 million floating rate Lehman note was purchased 3/20/07. The note reset daily to fed funds. Consequently, for duration purposes (but obviously not maturity purposes) the duration was 1 day, due to the daily interest rate reset date. However, the duration of the loans (lent securities) greatly exceeded the duration of the assets at the end of February, so reducing the duration of the assets, with the shortest term, overnight reset bonds contributed to a further reduction in the duration of the assets from 19 to 15 days, at a time when the duration of the assets needed to be increased in order to bring the portfolio into compliance with the contractual obligations of Wachovia. Consequently, the portfolio was not in compliance with the duration mismatch requirements set out in the securities lending investment criteria at the end of February, because the duration of the assets was 12 days below the duration of the loans. The 1-day duration Lehman note served only to further reduce the duration of the assets, helping to contribute to reducing the figures to 14 days, that was still 11 days below the duration of the loans at the end of March 2007. Consequently, the purchase of the $40 million Lehman note contributed in making the already out of compliance duration mismatch, further out of compliance – making the purchase of the $40 million Lehman note in violation of the Securities Lending Investment Guidelines between Wachovia and Sarasota.

Throughout the discovery period, we have seen no evidence that anyone at Wachovia was ever aware of the duration of the assets, the duration of the loans, or the duration mismatch between the two, nor did any correspondence disclose an awareness that the massive purchase of Lehman notes exacerbated the existing mismatch in duration.

Had Wachovia been attentively managing the duration mismatch, as they were required to do, they would not have been able to purchase the Lehman Brothers Note at all, much less in the $40 million amount to which they committed Sarasota's funds, since their fiduciary obligation would have forced them to correct the mismatched duration with another longer duration investment.

Maturity Mismatch

In this matter, Wachovia failed to determine the complete parameters of Sarasota's risk tolerance. In its absence, we are left with the primary objective of safety of principal. Keeping in mind that when Wachovia drafted the securities lending investment guidelines for Sarasota, Wachovia omitted any mention of limitation on maturity mismatch despite specific mention of the importance of such a provision in client guidelines according to the Comptroller of the Currency's guidelines repeated below:

> The bank should have a written investment policy addressing management of cash collateral. The policy should establish minimum investment guidelines including permissible types of securities, minimum credit quality standards, maturity and duration limits, <u>maturity mismatches</u>, and liquidity requirements." (emphasis added).[27]

Wachovia compounded the problem when it failed to consider maturity mismatch in its discretionary management of the Sarasota securities lending cash reinvestment portfolio.

---

[27] Custody Services Comptroller's Handbook January 2002, authored by the Comptroller of the Currency, Administrator of National Banks

As of the March, 2007 purchase date of the Lehman Brothers 2-year note no outstanding securities loan of the Sarasota portfolio had a maturity of as much as 6 months. The Lehman note created a $40 million maturity mismatch that extended an additional 18 months consequently adding significant, and unnecessary, default risk to the cash reinvestment portfolio – risk completely borne by Sarasota while paying 40% of the risk premium to Wachovia. In fact the Lehman note defaulted approximately 6 months before its expiration, meaning that but for the unnecessary (and undisclosed) extension of credit risk to Lehman Brother beyond the maturity of any security lending, Sarasota would have been paid any principal owed from Lehman approximately a year before Lehman defaulted.

In summary, Wachovia's purchase of the Lehman Brothers note simultaneously added to both duration mismatch and maturity mismatch. Wachovia had no motivation, other than the pursuit of higher yield, to purchase the Lehman note on behalf of Sarasota. These risks attendant to the purchase of the A-rated Lehman Brothers note at the time of the its purchase on March 20, 2007 were inconsistent with the investment objectives of Sarasota.

Wachovia's Fiduciary Responsibilities to Sarasota

Wachovia undertook a responsibility to manage Sarasota's securities lending cash collateral program according the to the risk averse guidelines of Sarasota.

      a. This responsibility is laid out in the Federal Reserve manual on securities lending: Fiduciary: "A lender which exercises *discretion* in offering securities on behalf of and for the benefit of customer-owners is acting as a fiduciary. For purposes of these guidelines, the underlying relationship may be as agent, trustee, or custodian. BHC Supervision Manual, December 1998, Section 2140.0.2

b.  As a fiduciary, Wachovia owed considerably more duty than insuring Lehman was an A rated credit by the major credit agencies.

Sarasota required that any investment carry a credit rating "A" or higher as a minimum necessary condition, not as a sufficient condition in and of itself.  The A rating was, at best, a starting point in Wachovia's investment decision process.  Not having a credit rating as high or higher than "A" would preclude it from consideration.  But simply having such a rating would not automatically provide sufficient basis for its purchase.

Financial Yields

As of the inception of Sarasota's securities lending program in 2006, credit ratings were viewed as fairly reflecting the credit risk of financial companies and industrial companies alike.  However, the yields associated with financial credit ratings increased over time as market conditions deteriorated due to the financial crisis.  The credit rating process of credit rating agencies was perceived to be slow to adjust to the implied credit ratings of financial companies as reflected in these market-driven yields.

1.  Bloomberg has historical fair market yield curves for USD Industrial (AAA, AA, A+, A, A-, BBB+, BBB, BBB-), and USD Finance (AA, A, BBB, BB).
2.  On June 30, 2002, "A" rated USD Financial sector yields were lower than "A" rated USD Industrial yields, with maturities 2 years or lower, i.e. investors were compensated MORE for purchasing debt instruments of industrial, as opposed to financial companies, such as banks.
3.  Reviewing yield curves semi-annually, the "A" rated USD Finance yields were always lower than "A-" USD Industrials through December, 2006 (i.e. the yields of 2 year financials didn't exceed "A-" industrials during this period).
4.  By the end of February 2007, the ABX 2006-2 BBB- index closed below 70 cents on the dollar, signaling the beginning of the subprime crisis in the United States.

5. By December 31, 2007 "A" rated USD Financials had 2-year yields that were in excess of "BBB-" rated industrial. "BBB-" is the lowest rated investment grade collateral. Hence the "A" rated financial yields were no longer in the investment grade industrial yield range. In other words, the perceived risk of "A" rated Financials by yield was no longer investment grade according to industrial yields, yet the Sarasota portfolio continued to exclusively hold financials in its corporate bond asset allocation.

By December 31, 2007, "A" rated USD Financial sector yields were higher than those of industrial BBB- companies. Lehman Brothers, and its financial sector brethren, had become perceived as bearing greater risk than investment grade non-financial issuers. Whatever the nominal credit rating last accorded by "two of the three" NSROs, the Bloomberg financial vs industrial yields were pricing financial companies as though they were not investment grade. By December, 2007, an investment in financial companies was inappropriate for the principal objective of Sarasota's securities lending collateral investment portfolio.

Lehman Credit Default Swaps (CDS)

The Bloomberg yields are for the financial sector in general. To understand the risk associated directly with Lehman Brothers, we analyzed 2-year (the maturity of the note in dispute) Lehman Senior credit default swaps, and compared them to the historical default rates reported by Moody's Investors Service ("Moody's") by alphanumeric credit rating and elapsed time.

In "Corporate Default and Recovery Rates, 1920-2006" released February 2007 and revised in June, 2007, Moody's reports in Exhibit 26 the Average Cumulative Issuer-Weighted global Default Rates by Alphanumeric Ratings from 1983-2006. This data summarizes historical cumulative default rates per alphanumeric credit rating by year after issue.

For A2 rated investment, the cumulative default rate over two years is 0.076%. That is, A2 rated investments default approximately 0.04% per year for two years, according to Moody's. A2 is the historical default rate associated with the minimum investment guidelines stipulated by Sarasota in the investment guideline.

To put this in perspective we list the following 2-year cumulative default rates for other alphanumeric credit ratings:

A2      0.076   4 bp/yr

Baa1    0.425   22 bp/yr

Baa3    0.893   45 bp/yr

Ba1     1.958   100 bp/yr

B1      8.135   410 bp/yr

B2      10.905 545 bp/yr

B3      17.753 900 bp/yr

Caa1    23.751 1200 bp/yr

Reviewing 2-year Lehman senior credit default swaps on Bloomberg, on December 18, 2006 the price of insuring Lehman against default is 9.25 basis points per year and on April 25, 2007 the price is 12 basis point per year.

We compare prices of Lehman 2-year CDS versus Moody's 2-year historical cumulative default rates.

| Date | Basis points | Equivalent Moody's rating by historical default rate |
|------|--------------|------------------------------------------------------|
| Dec 18, 2006[28] | 9.25 | A3 rating |
| Jul 10, 2007 | 22.9 | Baa1 rating |
| Jul 26, 2007 | 49.7 | Baa3 rating (Moody's lowest investment grade rating) |
| Aug 16, 2007 | >100 | Ba1 rating (exceeds 100bp speculative grade rating) |
| Jan 8, 2008 | >200 | 2 times level of speculative grade. |
| Mar 6, 2008 | >300 | 3 times the level of speculative grade. |
| Mar 10, 2008 | >400 | 4 times the level of speculative grade (B1 rating). |
| Mar 14, 2008 | >500 | 5 times the level of speculative grade (B2 rating). |
| Jul 14, 2008 | >600 | 6 times the level of speculative grade. |
| Sep 9, 2008 | >800 | 8 times the level of speculative grade. |
| Sep 10, 2008 | >1000 | 10 times the level of speculative grade (B3 rating). |
| Sep 12, 2008 | >1200 | 12 times the level of speculative grade (Caa1 rating). |

By the time Lehman entered bankruptcy on September 15, 2008, the 2 year credit default swaps were 130 times the level they were trading in December 2006.

Had Wachovia purchased a shorter maturity investment in Lehman Brothers it would have matured prior to the firm filing for bankruptcy. However having purchased the 2-year maturity note, Wachovia had an fiduciary obligation to monitor the performance of Lehman Brothers beyond its credit rating and to adhere to Sarasota's primary objective of safety of principal and sell the note as Lehman deteriorated. Wachovia had no exit strategy to remedy the deterioration of the Lehman investment in Sarasota's portfolio.

---

[28] Last reported price in December, 2006.

As the implied credit rating as measured by Lehman's CDS is steadily deteriorating, Wachovia ignores the deterioration in the Sarasota account, <u>but not for their own account,</u> where Wachovia tempered its counterparty lending policies with respect to Lehman Brothers during 2008 while continuing to expose Sarasota's collateral portfolio to the same risk <u>without ever informing Sarasota that it was reducing exposure to Lehman in its own accounts.</u> Wachovia, as a fiduciary, had a duty of undivided loyalty to Sarasota that would preclude it from exposing Sarasota, as its Client, to risks form which Wachovia was, at the same time, protecting itself. Wachovia's understanding of the deteriorating Lehman situation and its attempts to protect itself from any default by Lehman are illustrating in the following few excerpts from exhibits in discovery:

**March 14, 2008**

"NO Lehman cp until further notice…"[29]

**June 3, 2008**

"Although we are only purchasing Lehman O/N at the moment, we are officially restricting Lehman to O/N only from 33 days."[30]

**June 5, 2008** WGSL Credit Committee Meeting concerning Merrill and Lehman:

"A. Unsecured term exposure to both dealers would be permitted to run off, and no further term exposure added unless specially approved by the WGSL Credit Committee.

B. Unsecured overnight exposure to each dealer would be capped at 200M.

C. New overnight paper would be limited to accounts that have specifically approved Lehman or Merrill by name, as opposed to generically approving A1/P1 credits, or similar generic approval."[31]

---

[29] Depo. Exhibit 122
[30] Depo. Exhibit 135

**July 18, 2008** From Richard Chen to Abe Riazati

     "We have suspended o/n cp purchases earlier this week."[32]

The following illustrates the deteriorating Lehman credit default swaps and includes the first and last Wachovia email concerning Lehman restrictions above so that the reader can see the restrictions Wachovia is placing on Lehman investments in conjunction with the deteriorations in the market place as reflected in the Lehman credit default swaps.

Dec 18, 2006[33]    9.25       A3 rating

Jul 10, 2007      22.9       Baa1 rating

Jul 26, 2007      49.7       Baa3 rating (Moody's lowest investment grade rating)

Aug 16, 2007    >100      Ba1 rating (exceeds 100bp speculative grade rating)

Jan 8, 2008      >200      2 times level of speculative grade.

Mar 6, 2008      >300      3 times the level of speculative grade.

Mar 10, 2008    >400      4 times the level of speculative grade (B1 rating).

Mar 14, 2008    >500      5 times the level of speculative grade (B2 rating).

        Wachovia: "NO Lehman cp until further notice…"[34]

Jul 14, 2008      >600      6 times the level of speculative grade.

        Wachovia:     "We have suspended o/n cp purchases earlier this week."[35]

Sep 9, 2008      >800      8 times the level of speculative grade.

Sep 10, 2008  >1000     10 times the level of speculative grade (B3 rating).

Sep 12, 2008  >1200     12 times the level of speculative grade (Caa1 rating).

---

[31] Depo. Exhibit 141
[32] Depo. Exhibit 145
[33] Last reported price in December, 2006.
[34] Depo. Exhibit 122
[35] Depo. Exhibit 145

The correlation between increasing credit default swap prices and Wachovia's response to worsening Lehman's deterioration demonstrates that Wachovia's investment decisions did not rely solely on the A credit rating.  Look at Wachovia's actions versus Moody's Lehman credit rating:


April 2, 2007 Moody's rates Lehman A1.

March 14, 2008 Wachovia: "NO Lehman cp until further notice…"[36]

June 13, 2008  Moody's places Lehman on negative credit watch

July 17, 2008 Moody's cuts Lehman credit rating from A1 to A2.

July 18, 2008 Wachovia:"We have suspended o/n cp purchases earlier this week."[37]


Moody's credit ratings in and of themselves do not explain Wachovia's actions at this time.  Only when viewed in conjunction with the credit default swaps do Wachovia's actions make sense.  Moody's defines A rated entities as "obligations rated A are considered upper-median grade and are subject to low credit risk."[38]  It makes no sense for Wachovia to suspend overnight commercial paper purchases issued by such an entity solely on the basis of a downgrade in credit rating from A1 to A2.  As reflected by Wachovia's action at the time, the risks of the deteriorating situation were simply not being captured by the credit ratings.  Wachovia's fiduciary duty to Sarasota clearly extended beyond monitoring the meaningless credit ratings at the time, as reflected by their own actions.

---

[36] Depo. Exhibit 122
[37] Depo. Exhibit 145
[38] Moody's rating symbols and definitions p. 8.

Conclusions

At the purchase:

1)  The investment violated the investment guidelines in that there was a duration mismatch significantly greater than one day, and the purchase of the overnight resetting Lehman notes exacerbated this duration mismatch problem.

2) The investment was imprudent because of the massive maturity mismatch between the 2-year Lehman notes and the less than 6 month security loan terms.  Had the Lehman notes had maturities of 6 months or less, Sarasota would have sustained no losses from a Lehman investment.

3) Wachovia had no motivation, other than the pursuit of higher yield, to purchase the Lehman note on behalf of Sarasota.

After the purchase:

Some argue that the downfall of Lehman Brothers reflected escalating fears that led to a loss of confidence – ultimately becoming a real threat to Lehman's viability in a way that fundamental credit analysis could not have anticipated.  Whether true or false, this argument is irrelevant to the merits of the case that Sarasota brings against Wachovia.  Sarasota was not trying to forecast which companies would succumb to credit risk in the bankruptcy courts.  It was enough for their purposes to simply give a wide berth to such risk as inconsistent with their primary objective of safety of capital.

Wachovia's fiduciary responsibility to Sarasota went beyond credit risk.  It encompassed the avoidance of any risk that could compromise the safety of Sarasota's capital.   That necessarily included the loss of confidence as reflected in the credit default swap market, and in the massive yields required by the financial sector to compensate investors for perceived risk.

In managing Sarasota's portfolio, Wachovia ignored:

    i.   financial A rated yields exceeding the yields of BBB- industrial rated yields, implying the entire A rated financial sector had risk no longer associated with investment grade instruments.

    ii.   ever-increasing credit default swap prices that indicated a market risk to the Lehman investment many times over that associated with junk bonds.

    iii.   that they themselves were severely restricting their own exposure to Lehman.

Wachovia for reasons already stated should not have invested in the Lehman Brothers 2-year note. Additionally, Wachovia should have sold the note as market conditions deteriorated. Wachovia violated a fiduciary duty of undivided loyalty to Sarasota when it reduced its own exposure to Lehman while maintaining Sarasota's Lehman position. This violation was compounded by Wachovia's failure to disclose to Sarasota that it was reducing its' own exposure to Lehman Brothers, the corporate issuer to which Sarasota had its largest single corporate exposure.

Respectfully Submitted,

Robert E. Conner

Thornapple Associates, Inc.

450 Springfield Avenue

Summit, New Jersey 07901

Tel: (908) 277-0003

rconner@thornapple.net

6 February, 2012

Attachment A

Complaint dated June 23, 2010

Complaint Exhibits A through I

Answer dated December 13, 2010

Moody's Corporate Default and Recovery Rates, 1920-2006, released February 2007, revised June 2007

Sarasota County Investment Policies

WACH-SARA 0010384

Bank Holding Company Supervision Manual, December 1998

Custody Services Comptroller's Handbook, January 2002

Florida Statute 218.415

Transcript of Deposition of Richard Chen

Transcript of Deposition of Terry Crow

Transcript of Deposition of Brian Gorman

Transcript of Deposition of Nicole Jovanovski

Transcript of Deposition of Jeff Kern, v. 1 and v. 2

Transcript of Deposition of Daniel Murphy

Transcript of Deposition of Kevin O'Connor

Transcript of Deposition of Peter Ramsden

Transcript of Deposition of Karen Rushing

Transcript of Deposition of Frank D. Souder, Jr.

Transcript of Deposition of Anjali Takhar

Transcript of Deposition of Lynn Thompson

Deposition Exhibits 1 through 263

Attachment B

ROBERT E. CONNER
*Thornapple Associates, Inc.*
*450 Springfield Avenue*
*Summit, New Jersey 07901*
*Work: (908) 277-0003*
*Mobile: (908) 727-7007*
rconner@thornapple.net

*Background and Experience*

Thirty-four years experience in the securities industry. Clientele have included the Securities and Exchange Commission, the Internal Revenue Service, U.S. and state-level Attorneys General and Securities, Banking and Insurance Commissioners, both U.S. and foreign individual and institutional investors, banks and insurance companies, operating corporations and LLCs, brokerage firms, ERISA pension and profit-sharing plans, registered investment advisors, market-makers, hedge funds, non-profit organizations and foundations, bankruptcy trustees, trusts and estates. Business mix: 60% U.S. / 40% International.

**1983-**
**Present**      **Thornapple Associates, Inc.**, Summit, NJ: Founding member of a firm engaged in expert witness services in connection with trials, arbitrations and regulatory proceedings related to the securities and commodities industries. Testimonial and analytic experience since 1983 in over 750 disputes involving both equity and debt instruments and their specific-issue and index derivatives, as well as options, futures and forward contracts on commodities, financial indices and foreign currencies. Expertise extends to asset allocation, portfolio management and hedging, fundamental security analysis, trading, prime broker operations, margin, structured products, collateralized mortgage obligations (CMOs), securities industry practice and standards, after-tax considerations, suitability, adequacy of risk disclosure, risk arbitrage and direct investments, loss causation and damages.

**1983–**
**1998**      **Conner Capital Corp.**, Summit, NJ: President and portfolio manager of an independent investment management firm with approximately $200 million in primarily equity portfolios for U.S. and foreign taxable corporate, pension and individual accounts, including dividend capture and hedged risk arbitrage in after-tax investment strategies employing stock and index options and futures contracts, warrants, and convertible bonds and preferred stocks.

**1980 –**
**1983**      **Prudential Insurance Company of North America:** Director, Options Management; Bond and Stock Departments Inaugurated Prudential's use of derivative hedging instruments in a multi-strategy $50 million pilot option program. Co-portfolio manager of over $300 million in mutual fund assets, to include special purpose tax-managed strategies, as well as the first U.S. mutual fund to incorporate the use of stock index futures contracts. Established trading desk and clearing operations with a multiple prime broker network utilizing approximately 15 executing brokers employing stocks, stock and index options, convertible bonds and preferred stocks and exchange-traded financial futures contracts (e.g. S&P 500), and a master trust bank custodial arrangement with respect to in-house managed mutual funds. Established Prudential stock loan program and devised computer monitoring of same. Treasurer of a state-chartered subsidiary bank. Advised as to hedging provisions in various corporate and commercial financings.

**1979-**
**1980**      **Drexel Burnham Lambert:** Vice President, Co-headed Institutional Options Department. Managed discretionary accounts for individual investors, pension plans and college endowments, and provided research and transactional coverage of non-discretionary accounts of high net worth individuals, investment advisors, mutual funds, insurance companies, corporations, partnerships, hedge funds, foundations, college and preparatory school endowment funds, trusts and pension and profit-sharing plans. Authored option strategy commentaries as part of weekly firm equity research publication, *"Tale of the Tape."* Designed third-party computer program for on-line portfolio management.

**1977-**
**1979**      **Donaldson, Lufkin & Jenrette, Inc.:** Registered Representative, Options Department. Managed discretionary accounts for individual investors, pension plans and college endowments, and provided research and transactional coverage of non-discretionary accounts of high net worth individuals, investment advisors, mutual funds, insurance companies, corporations, partnerships, hedge funds, foundations and endowments, trusts, and pension and profit-sharing plans.

*Representative Litigation, Arbitration and Disciplinary Matters*

1.  **Rosen Capital Partners, LP and Rosen Capital Institutional, LP v. Merrill Lynch Professional Clearing Corp.,** FINRA Arbitration No. 09-03094
    Testifying expert for Claimant. Award in favor of Claimant: $79.42 million.
    $125 MM option hedge fund Claimants asserted breach of contract, duty of good faith and reasonable commercial standards of fair dealing, Articles 8 & 9 of the New York U.C.C., fraud and negligence in applying margin and risk requirements, unauthorized refusal to clear risk-reducing option hedge transactions, and wrongful liquidation via fraudulent inducement by senior risk management of a prime broker.

2.  **Bayou Group, LLC v. Goldman Sachs,** FINRA Arbitration No. 08-01763
    Testifying expert for Claimant. Award in favor of Claimant: $20.58 million.
    Claimant, Trustee for a Creditor's Committee in Bankruptcy, asserted fraud, failure to investigate the fraud, and fraudulent transfers by prime broker Respondents in connection with $450 million hedge fund Ponzi scheme.

3.  **Manhattan Investment Fund Ltd. v. Bear Stearns Securities Corp.,** U.S. Bankruptcy Court, SDNY, Adv. Pro. No. 01-02606
    Testifying expert on notice issue for Plaintiff, Trustee of a Creditor's Committee in Bankruptcy. Court found prime broker Defendant to be on notice of fraud. Jury decision for Defendant based on good-faith defense. Plaintiff asserted fraud, failure to investigate the fraud, and fraudulent transfers to prime broker Defendant in connection with $450 million hedge fund Ponzi scheme.

4.  **Insurance Commissioner for the State of Delaware, as Receiver for National Heritage Life Insurance (NHL) Company, a Company in Liquidation, v. Bear Stearns & Co., Inc.,** Ninth Judicial Circuit, for Orange County, Florida, Magistrate Division 2, Case No. 48-1996-CA-000669-O
    Testifying expert for Plaintiff. Magistrate Order in favor of Plaintiff: $26.85 million.
    Plaintiff asserted breach of contract and good faith in providing investment advisory services, knowingly selecting and constructing a portfolio of high-risk, extremely volatile collateralized mortgage derivative securities inappropriate for Plaintiff's investment objectives and providing analyses, projected yields and other financial information which was deceptive, misleading and inaccurate, and which Plaintiff could not independently verify.

5.  **Hauser v. Merrill Lynch,** NYSE Arbitration No. 1993-03312
    Testifying expert for Claimant. Award in favor of Claimant: $3.5 million
    Swiss Claimant asserted fraud, misrepresentation, and failure to supervise registered representatives of a Lugano, Switzerland branch office of Respondent in connection with a "black money" scheme that damaged the Swiss trust company used as a conduit for cash flows and excessive foreign currency trading in fiduciary accounts.

6.  **John Tilling v. S.W. Bach & Co.,** NASD Arbitration No. 04-01896
    Testifying expert for Claimant. Award in favor of Claimant: $471,000, including $291,000 in disgorgement of commissions and fees.
    British Claimant, Member of Lloyds of London, asserted churning, unsuitability, breach of fiduciary duty and common law fraud related to discretionary transactions in stocks and Treasury bonds.

7.  **Blumenfeld, et al. v. Refco,** NFA Arbitration No. 96-186
    Testifying expert for Claimant. Award in favor of Claimants: $43 million.
    As part of a $100 million Ponzi scheme by an Introducing Broker (IB) the wrongful allocation of Treasury futures and options transactions on the Chicago Board of Trade (CBOT) by a Futures Commission Merchant (FCM) across Claimants' accounts, Claimants asserted fraud, breach of contract and good faith, failure to supervise floor trading and post-transaction clearance by back office personnel in violation of industry and exchange rules.

8.  **Securities and Exchange Commission v. Abraham and Sons Capital and Brett G. Brubaker**
    Admin. Proc. File No. 3-9448
    Testifying expert for the S.E.C. Civil penalties and bar from association with broker-dealer or registered investment advisor.
    Registered investment advisor and its president found to have made material fraudulent misrepresentations in connection with stock transactions, mispricing and reported performance of a managed short-stock portfolio.

*Representative Litigation, Arbitration and Disciplinary Matters  (Cont.)*

9.  **Parker v. Goldberg,** NASD Arbitration No. 94-02670
    Testifying expert for Claimant.  Award in favor of Claimant: $260,000
    Registered investment advisor and its president made fraudulent representations to, and effected imprudent
    discretionary investments for Claimant in stocks, private placements, limited partnerships, and direct investments.

10. **Pon v. Shearson,** NYSE Arbitration No. 2000-01748
    Testifying expert for Claimant. Award in favor of Claimant: $1,000,000  + $250,000 punitive damages.
    Misrepresentation of investment performance and recommendation of unsuitable equity securities.

11. **Lane v. Drexel Burnham Lambert,** American Arbitration Association No. 13-136-00617-88
    Testifying expert for Respondent.  Award in favor of Respondent: $6,000,000
    Unsecured debit arising from futures trading loss in metals and financial indices in excess of $22 million.

12. **Securities and Exchange Commission v. Jeremiah J. and Michael P. Hegarty**
    Admin. Proc. File No. 3-10455
    Testifying expert for S.E.C.
    Civil penalties and bar from association with broker-dealer or registered investment advisor.
    Principals of Hyannis Trading Advisors defrauded Clients of approximately $6.5 million under management in
    option trading accounts, and failed to disclose that they had lost the ability to calculate fundamental account
    balances and other information, misrepresented past performance, collected illegal performance fees, and had
    abandoned risk-limiting techniques that they had assured Clients would be utilized.

13. **Securities and Exchange Commission v. Parnassus Investments.**
    Admin. Proc. File No. 3-9317
    Testifying expert for S.E.C.  Cease and desist order with civil penalties.
    Court found that the Investment Advisor had overstated the net asset value (NAV) of the diversified open-end
    fund (mutual fund) in violation of the Investment Act of 1940 by failing to use a current sale methodology to
    fairly value a holding in keeping with Accounting Series Releases 113 and 118, Investment Company Act
    Release No. 6295, S.E.C. Accounting Rules.

14. **Weingarden v. Prudential Securities,** NASD Arbitration No. 03-04704
    Testifying expert for Claimant. Award in favor of Claimant: $1,900,000
    Claimant alleged unsuitability and failure to disclose material risks in connection with stock and margin
    transactions, negligent supervision and violation of Florida Statutes and trust law in connection with unlawful
    transfers of securities into and out of an Irrevocable Trust.

15. **Fanam, LLC v. Merrill Lynch,** NASD Arbitration No. 04-05063
    Testifying expert for Claimant. Compensatory Award in favor or Claimants: $980,000
    Claimant asserted breach of contract, negligence, failure to supervise, willful and reckless
    conduct and breach of fiduciary duty in connection with stock and options transactions in unapproved strategies
    and unpermitted wire transfers out of Claimant's account to a gambling casino in connection with criminal
    actions by the managing partner/trader of the Claimant hedge fund, for which he was imprisoned.

16. **Goodman v. Mirco Teta and CIBC Oppenheimer & Co.,** NASD Arbitration No. 98-04636
    Testifying expert for Claimant. Award in favor of Claimant: $74,000
    Panel found that Respondent broker committed securities fraud in violation of Rule 10b-5 of the Securities and
    Exchange Act of 1934 through misrepresentation in connection with stock transactions upon which Claimant
    reasonably relied.

17. **Errico v. Bank of America,** JAMS Ref. No. 1400008354
    Testifying expert for Claimant. Award in favor of Claimant of $280,000.
    Claimant alleged gross negligence, breach of contract by a bank trust department in the mismanagement of a
    discretionary equity portfolio, and fraud by misrepresentation in the undisclosed use of debt leverage.

*Representative Litigation, Arbitration and Disciplinary Matters  (Cont.)*

18.  **Gruhn v. E*Trade Securities**, NASD Arbitration No. 01-00492
     Testifying expert for Respondent.  Award in favor of Claimant: $191,000
     German on-line investor and computer hacker sought over $5 million in compensatory and punitive damages in connection with unapproved stock and naked option transactions executed in a cash account approved for covered call writing only, and in excess of account buying even were it a margin account power pursuant to Regulation T. Claimant nonetheless asserted breach of contract, conversion, fraud and negligent misrepresentation. As Respondent's expert, gave testimony regarding new account misrepresentations by investor, inaccuracies in the third-party software utilized by the Claimant to identify and select the option transaction, Claimant expert's misinterpretation of covered-call definition under Regulation T, the inadequacy of Claimant account net equity to support initial margin requirements, absence of economic return due to parity condition of in-the-money option prices at the time of transaction, and consequent absence of damages.  Panel, finding no damages, directed Respondent brokerage firm to share with Claimant half of the $382,000 error account profit from having liquidated the violative stock and option transaction to partially offset Claimant's travel and hearing expenses.

19.  **NASD Dept. of Enforcement v. Keith Medeck**, Disciplinary Proceeding # E9B2003033701
     Testifying expert for Respondent.  In 2006, Hearing Panel barred Respondent from associating with any NASD member in any capacity for churning a customer's account in violation of Rule 10(b)-5 of the Securities and Exchange Act and a $41,493 monetary fine in connection with stock and option transactions.  In 2009, the Hearing Panel's decisions were reversed on appeal to the National Adjudicatory Council, FINRA.

20.  **Kaminsky, et al. v. Spencer Trask Securities**, NASD Arbitration No. 00-05628
     Testifying expert for Claimants.  Award in favor of Claimants: $294,000 + $50,000 in punitive damages.
     Case involved verbal contracts entitling Claimants to participate in most successful IPO in Wall Street history, with consideration of Rule 144 Restricted shares and lock-up agreements in connection with a spot secondary.

21.  **Tornquist v. Shearson**, NYSE Arbitration No. 1990-07063
     Testifying expert for Claimant.  Award in favor of Claimant: $900,000   Disciplinary referral of branch manager. Claimant alleged unsuitable investment recommendations, misrepresentation, and churning in stock and options by registered representative exercising de facto discretion, and failure to supervise by branch manager.

22.  **Flanagan v. Prudential Securities**, NASD Arbitration No. 91-00001
     Testifying expert for Claimant.  Award in favor of Claimant: $982,000
     First make-whole compensatory award secured in arbitration in connection with unsuitable limited partnership investments jointly marketed by securities brokers and insurance agents to emergent retirees without adequate risk disclosure of their speculative risk, illiquidity and structural performance and cash flow characteristics. Claimants were a married couple newly retired from a major oil company who had been directed to consult with a professional investment advisor as a condition of receiving lump sum distribution of their retirement assets.

23.  **Coke v. Prudential Securities**, NASD Arbitration No. 89-00700
     Testifying expert for Claimant.  Award in favor of Claimant: $1,030,000
     Claimant, a mother of pre-school children and widow of a U.S. Marine Corps helicopter pilot, alleged gross negligence, breach of fiduciary duty and inadequate risk disclosure by a branch manager exercising de facto discretion over her brokerage account in connection with naked put and call option transactions and the purchase of unsuitable and speculative limited partnership investments on her behalf.

24.  **Wholey, et al. v. Goldman Sachs**, NYSE Arbitration No. 1992-02598
     Testifying expert for Claimants.  Rescission Award in favor of Claimants: $2,800,000 + fees
     Claimants alleged unsuitability, material misrepresentation and inadequate disclosure of risk in connection with recommended purchases of U.K. auction rate and remarketed variable term preferred shares of Ratners Group that collapsed in $450 million par amount of failed auctions.

25.  **Roth v. GKN Securities**, NASD Arbitration No. 98-04988
     Testifying expert for Claimant.  Rescission Award in favor of Claimants: $582,215
     Claimant alleged failure to give proper notice of margin call, unauthorized liquidation by introducing broker (IB) upon instruction by clearing broker and breach of contract with Claimant.  Testified as to the duties of clearing v. introducing brokers and reasonable notice prior to margin liquidation, and appropriateness of "rescission" as damage remedy. Introducing broker ordered to replace liquidated shares at appreciated value as of date of Award.

*Publications*

1. Punitive Damages Against Fiduciaries, Probate Cases, and Equitable Relief,    25 *Probate and Property Magazine* 43 (American Bar Association, Issue No. 3, May/June, 2011) (co-authors John Pankauski and Laurence A. Steckman).

2. Punitive Damages Against Fiduciaries: Allowing Punitive Damages Where Equitable Relief is Sought, 84 *Florida State Bar Journal* 40 (No. 9, November and No. 10, December, 2010, at 42) (co-authors John Pankauski and Laurence A. Steckman).

3. Litigating Offset Arguments in Compensatory Damage Litigation and Lead Plaintiff Motion Practice: Are apparently inconsistent outcomes reconcilable?, co-author: Laurence A. Steckman, Esq., Journal of Securities Law, Regulation & Compliance, Volume 3 No. 2, April 2010, pp. 150-179, Henry Stewart Publications, London, U.K.

4. Index Adjusted Portfolio Damages in Securities and Investment Fraud Litigation, co-author: Laurence A. Steckman, Esq., Journal of Securities Law, Regulation & Compliance, Volume 2 No. 4, September 2009, pp. 360-379, Henry Stewart Publications, London, U.K.

5. The Unsuitability of the "Suitability Rule' – Why FINRA's Current Interpretation of Conduct Rule 2310 Undermines Investor "Holding Claim" Entitlements in Contemporary Markets, co-author: Laurence A. Steckman, Esq., The Journal of Business, Entrepreneurship & the Law, Pepperdine University School of Law, Volume II No. I, April 2009, pp. 122-141 (*reprinted in modified form from 2008 Securities Arbitration, Ch. 15, pp. 177-230, Practising Law Institute (PLI), New York*)

6. Mitigation of Damages in Securities and Commercial Litigation and Arbitration, co-authors: Laurence A. Steckman, Esq. and Courtney B. Bellaire, Journal of Securities Law, Regulation & Compliance, Volume 2 No. 2, March 2009, pp. 103-114, Henry Stewart Publications, London, U.K., *reprinted Securities Arbitration 2009, Ch. 13, pp. 491-505*, PLI, NY, cited and discussed in Securities Arbitration and Procedure Manual, Robbins, Sec. 5-17, at 5-249-250; 2009

7. The Unsuitability of the "Suitability Rule": Why FINRA's Current Interpretation of Conduct Rule 2310 Undermines Investor "Holding Claim" Entitlements in Contemporary Markets, co-author: Laurence A. Steckman, Esq. & James Trainor, Esq., Securities Arbitration 2008, PLI, NY, cited Winnard, 104 Nw. U. L. Rev. 671, at ns. 200-202 (Spring 2010), reprinted in modified form, 2 *Pepperdine Journal of Business, Entrepreneurship and the Law* 122-141 (No. 1, 2009)

8. Option Backdating: Important as to Corporate Integrity, but not Material as to Stock Valuation, Business Torts, Volume 11, No. 3, Spring 2007, American Association for Justice (formerly American Trial Lawyers Association), Washington, D.C.

9. Looking for the Exits: A Fiduciary's Sell Strategy Under the Prudent Investor Act, co-author: John Jeffrey Pankauski, Esq., Vol. 20 Probate & Property (No. 6, Nov./Dec. 2006) at 40, Pub. Real Property, Probate & Trust Law Section, American Bar Association, Chicago, IL.

10. Mitigation of Damages in Securities Litigation and Arbitration, co-authors: Laurence A. Steckman, Esq., Steve Getzoff, Esq., and Courtney Bellaire, Securities Arbitration 2004, PLI, NY

11. Expert Testimony?, co-author: Courtney Bellaire, Securities Arbitration 2002, PLI, NY

12. Computation of Benefit of the Bargain Damages in Cases Alleging Fraud in the Sale of Bonds, co-author: Laurence A. Steckman, Esq., Securities Arbitration 2001, PLI, NY

*Publications  (Cont.)*

13. Loss Causation Under Rule 10b-5: A Circuit by Circuit Analysis, co-author: Laurence A. Steckman, Esq., Securities
    Arbitration 1998, PLI, New York, N.Y., *reprinted RICO Law Reporter*, Vol. 28, No. 2, at 173-231 (August 1998),
    Washington, D.C.; *reprinted Private Securities Reform Act Litigation Reporter*, Vol. 5, No. 6 at 897-956 (September
    1998), Washington, D.C., cited Razzano, 4 *The Securities Reporter* at 17 (1999); cited Escoffery, 68 *Fordham L. Rev.*
    *1781, ns. 16, 92, 94, 125, 152-154, 157, 164, 178, 206, 232 and 363* (April 2000); cited Foster, 23 *Mich. J. Int'l L.*
    265, 340, n. 213 (2002); cited Van Hoey, *Wash. & Lee L. Rev.* 249, 307, n. 221 (2003); cited Holbrook, 39 Tx. J. of
    Bus. L. 215, 259, ns. 2, 42, 58, 178, 179, 253, 260, 301, 302, 304, 326 (2003); cited Thorson, 6 Wym. L. Rev. 623,
    656, n. 72 (2006); cited Olazabals, 3 Berkeley Bus. L. J. 337, 380, n. 57 (2006).

14. Arbitral Awards in Excess of Actual Damages, co-author Laurence A. Steckman, Esq., New York Law Journal,
    January 11, 1996, NY

15. Lost In Translation: Cross-Currency Damage Calculations, co-author: Courtney Bellaire, Securities Arbitration 1996,
    NY

16. Explicit Bet Recognition in Foreign Currency Applications of Options, Futures, and Forwards, Public Investors
    Arbitration Bar Association, 4th Annual Meeting, October, 1995, Carlsbad, California

17. Computing Damages in Rule 10b-5 Unsuitability Cases: Litigating "Offset" Defenses, co-author: Laurence A.
    Steckman, Esq., Securities Arbitration 1994, PLI, NY; cited Berg, *Securities Arbitration 1995*, 507, 522 (PLI 1995).

18. Catch-22(b)(5): And Other Expert Witness Reflections, co-author: Courtney Bellaire, Securities Arbitration 1993,
    PLI, NY

19. Limited Partnership Suitability Factors and the Flanagan v. Prudential Securities, Make-Whole Award, co-author:
    Stuart C. Goldberg, Esq., Securities Arbitration 1992, PLI, NY

20. A Revisionist Theory of Churning and Market Exposure, co-author: Courtney Bellaire, Securities Arbitration 1991,
    PLI, NY

21. Expert Witness Testimony: Practical Considerations for Counsel, Securities Arbitration 1990, PLI, NY

22. Option-Related Securities Disputes: Analytical Considerations, Securities Arbitration 1989, PLI, NY

23. Financial Analysis of Claim and Presentation at Hearing, Securities Arbitration 1988, PLI, NY

24. I got risk?,Investment Management Review, January/February 1988, NY

25. Determining the Fair Value of Stock Options, Pensions & Investment Age, May 25, 1981, NY

# ROBERT E. CONNER

rconner@thornapple.net

## *Education*

| | |
|---|---|
| **1975-1977** | Harvard Business School; MBA, 1977; finance and real estate emphasis |
| **1974-1975** | Massachusetts Institute of Technology; cross-studies in military defense budgeting in connection with Harvard Ph.D. program |
| **1973-1977** | Harvard University, John F. Kennedy School of Government; MPA, 1974; dual Ph.D. studies in political economy and government; foreign policy, causal modeling, statistics |
| **1971-1973** | University of California at Santa Barbara; BA, 1973, History & Political Science, summa cum laude Distinguished Political Science Graduate; Minors: mathematics, Russian, Spanish |
| **1969** | U.S. Institute for Advanced Russian and East European Studies, Garmisch, Germany; Soviet intelligence studies under Russian language immersion (Foreign Area Specialist Training) |
| **1968-1969** | University of Maryland, Berlin, Germany; undergraduate studies - Soviet foreign policy |
| **1964-1966** | University of Miami, Coral Gables, FL; undergraduate studies - marine biology, mathematics, Russian |

## *Advisory and Teaching Positions*

| | |
|---|---|
| **1982-1985** | **Chicago Mercantile Exchange, International Monetary Market (IMM), Financial Instruments Advisory Committee:** Member: - advised regarding financial index, foreign currency and Treasury-Eurodollar (TED) spreads, futures and options contracts, and floor trading procedures and rules. |
| **1980-1983** | **New York Institute of Finance, NY;** Instructor – basic and advanced options strategies |
| **1980-1983** | **Pace University,** Graduate School of Business, NY; Adjunct Assistant Professor - finance and statistics; equity and index options and futures contracts. Taught evening courses for Wall Street professionals in MBA and PhD programs. |
| **1971-1973** | **University of California at Santa Barbara;** Instructor – Russian, Spanish, German, Italian |

## *Arbitrator Positions*

Financial Industry Regulatory Authority (FINRA) (formerly NYSE & NASD)
National Futures Association (NFA)
American Arbitration Association (AAA)

## *Military Experience*

| | |
|---|---|
| **1966-1971** | U.S. Army, Captain, Military Police Corps |
| **1967-1969** | West Berlin, Germany: U.S. Russian Liaison Officer |
| **1969-1971** | South Vietnam: Company Commander, Detachment Commander, Criminal Investigator, Provost Marshal, MACV Military Advisor, Vietnamese and Spanish translator. |

## *Foreign Languages*

| Spanish | Russian | German | Italian | French | Vietnamese |
|---|---|---|---|---|---|

## *Miscellaneous*

| | |
|---|---|
| **1988-Present** | Aircraft Owners & Pilots Association; Aerospatiale Trinidad TB-20 (N20VC) Commercial Pilot, instrument-rated, single engine land |

Attachment C

# ROBERT CONNER DEPOSITION/TESTIMONY LOG IN COMPLIANCE WITH FRCP 26(A)(2)(B)

| Plaintiff/Claimant | Defendant/Respondent | Testimony | Deposed | Forum | Case # | Dates |
|---|---|---|---|---|---|---|
| Carpenter | v American Express Financial | x | | NASD | 07-00115 | 2/29/08 |
| Phillips | v Merrill Lynch | x | | NASD | 06-01748 | 5/6-8/08 |
| Manhattan Fund | v Bear Stearns | x | x | US Bankruptcy Court (SDNY) | 01-02606 | 12/20/05 - 6/23/08 |
| Soal | v Coleman | x | | FINRA | 08-00828 | 6/29-30/09 |
| Pompilio | v Goldman Sachs | x | | NASD | 05-00557 | 10/27-11/5/09 |
| DaPuzzo | v Myers | x | | FINRA | 08-04392 | 10/7/09 & 12/15/09 |
| Bayou Group, LLC | v Goldman Sachs (GSEC) | x | | FINRA | 08-01763 | 11/12/09-2/6/10 |
| Sullivan | v Harnisch, et al. | | x | NY State Supreme Court | 08/115092 IAS Part 56 | 3/3/10 |
| Horowitz | v Gardner Lewis Asset Management | x | | CA Superior Court - Los Angeles | BC 406551 | 3/15/10; 9/27/10 |
| Smith & Wesson Holding Corp. Sec. Lit. | | | x | US District Court (MA) | 07-CV-00238-MAP | 10/6/10 |
| Lam | v Goldman Sachs | x | | NASD | 05-01577 | 11/22-23/2010 |
| Cadent Financial Services, Inc. | v David Cartwright, et al. | x | | NYMEX | 09-04 | 12/7/10, 12/7/10 |
| Zilber | v Penson | x | | FINRA | 09-03618 | 2/15/11 |
| Coffey | v Merrill Lynch | x | | FINRA | 09-03931 | 3/4/11 |
| Manley | v Deutsche Bank Securities, Inc. | x | | FINRA | 09-01469 | 3/17/11 |
| Rosen | v Merrill Lynch | x | | FINRA | 09-03094 | 5/11/11 |
| Overstock | v Morgan Stanley, et al. | | x | CA Superior Court - San Francisco | CGC-07-460147 | 10/14-15/11 |
| Pepp | v Alliance Bernstein | x | | FINRA | 08-04776 | 10/20-21/11 |
| Murphy, et al. | v Mat Five LLC Fund, et al. | x | | FINRA | 09-03065 | 12/15/11 |