EXHIBIT B

Page 1

```
 1
 2              UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
 3
                Case No. 8:10-cv-01572-SCB-AEP
 4
     -----------------------------------------X
 5
     KAREN E. RUSHING, as Clerk of the Circuit
 6   Court and County Comptroller of Sarasota
     County, Florida,
 7
                              Plaintiff,
 8
                     vs.
 9
     WELLS FARGO BANK, N.A., as successor,
10   in-interest to Wachovia, N.A.,
11                            Defendant.
12   -----------------------------------------X
13
             VIDEOTAPED
14           DEPOSITION OF: ROBERT CONNER
             DATE:          April 10, 2012
15           TIME:          9:41 a.m. - 6:57 p.m.
             PLACE:         Sarasota County Attorney
16                          1660 Ringling Boulevard
                            Second Floor
17                          Sarasota, Florida 34236
18           PURSUANT TO:   Notice by Counsel for Defendant
                            for purposes of discovery use at
19                          trial and such other purposes as
                            are permitted under the Florida
20                          Rules of Civil Procedure.
21           BEFORE:        Elizabeth W. Cruz, Court Reporter
                            Notary Public - State of Florida,
22                          at Large.
23
24
25
```

Page 28

Conner

1
2    certain types of security can be eligible for margin

3    treatment, certain types of securities need to be

4    delivered or there may be restrictions on the delivery.

5    All of this goes into assessing the risks of engaging in

6    certain types of strategies with certain types of

7    securities and circumstances.

8              So, you don't run that department but you get

9    to a point where you are knowledgeable of what makes it

10   tick and how it relates to you.

11        Q.    Did you either at Drexel or at Donaldson,

12   Lufkin ever have the occasion to review securities

13   lending agreements?

14        A.    No.

15        Q.    What about the master loan agreements between

16   the borrowers and the securities lending agency?

17        A.    I didn't review the securities loan

18   agreement.  I would have no knowledge about their

19   documents at the time other than to see a sample of one.

20   I am sure I saw the sample of what they do, but I wasn't

21   involved in utilizing them or anything like that.

22        Q.    Then in 1980 you moved to Prudential?

23        A.    That's correct.  Prudential Insurance Company

24   of North America.

25        Q.    Why did you do that?

Page 29

Conner

1

2    A.    I was -- I had left Drexel and I wanted to go

3    to the -- I considered staying on the sale side of the

4    business, but I was also very interested -- the sale side

5    meaning the broker's side.  But I liked working with

6    management, the discretionary side of the business I was

7    doing and I was interested in moving to the investment

8    management side or buy side of the business as opposed to

9    the transactional-driven side.

10             In the course of my contacts, Prudential

11   Insurance Company was looking for someone to head up the

12   introduction of Prudential into the use of derivatives

13   and they had looked in-house.  They had looked at people

14   at other insurance companies, at other management firms

15   and I was recommended by a managing director over at

16   Solomon Brothers as someone Prudential should talk to.

17             So, they offered me the position of being

18   Director of Options Management in their bond department

19   and setting up an entire program from scratch, which

20   included basically an independent stand-alone department,

21   so, like creating an investment management firm inside

22   Prudential, even though they already had equity trading

23   desks and bond trading desks and separate stock and bond

24   departments.

25             In this case, it was basically a separate

```
                                                    Page 30
 1                            Conner
 2    department that would be involved both in fixed income
 3    and equities with the added use of options and other
 4    derivatives.
 5              So, to me this was a great opportunity.  This
 6    was back at a time where Prudential Insurance Company had
 7    not yet gotten any involvement with a broker dealer.  I
 8    think they had a small -- I know they had a small broker
 9    dealer in-house that was not really active, but this was
10    prior to the eventual acquisition, that was Bache
11    Securities.  That was '81.
12              This was about a year before Prudential
13    Insurance first acquired or became involved with a
14    broker/dealer firm.  It was strictly an insurance company
15    who was also on the investment side.  I think it was the
16    largest institutional investment manager in the United
17    States.  It had about 7 billion in equities and about 40
18    to 60 billion in fixed income.
19        Q.    Did you have any involvement in the
20    securities lending at Prudential?
21        A.    Yes.
22        Q.    What was the nature of your involvement in
23    securities lending at Prudential?
24        A.    I inaugurated securities lending for
25    Prudential.  Under the direction of the treasury, the
```

Page 31

Conner

1    treasurer of Prudential, I was given the responsibility,

2    in addition to the other things I was doing, to set up

3    from scratch securities lending operation for Prudential.

4    I did that and I also designed the computer monitoring

5    system to be able to handle the administration from, in

6    this case, the supply side, the lending out of

7    securities, to a whole variety of Wall Street brokerage

8    firms to which we would be lending the securities,

9    Goldman Sachs, Merrill Lynch, First Boston, Solomon

10    Brothers, right on down the line.

11         Q.    So, was Prudential functioning as a

12    securities lending agent for clients at that point?

13         A.    They were, in effect, yes, because the bulk

14    of the securities being lent were for money management

15    clients at Prudential.

16              The bulk of the 7 billion in equities were

17    equity clients, institutional clients for which

18    Prudential Insurance was a registered investment manager

19    and the same applied to the majority, but not all of the

20    fixed income side.

21              Prudential also had its own holdings in

22    securities, but the majority of its securities holdings

23    in both equity and fixed income side were client's

24    holdings.  So, in that sense they were acting as an agent

```
 1                           Conner
 2    for ultimately client securities.
 3         Q.    Do you remember, were you involved in
 4    negotiating any securities lending agreements with
 5    clients at Prudential?
 6         A.    I was certainly involved in what the
 7    agreements contained early on.  I was more or less
 8    setting up how the operation was set up.  I didn't get
 9    involved in going out and visiting the clients and how
10    they may have varied from one client to the next.  But
11    the general structure of how we did it I certainly was
12    involved in, was part and parcel of setting up the
13    activity.
14              I wouldn't be the point of contact, for
15    example.  Let's say you had a large pension fund that
16    was, that had a few hundred million dollars with
17    Prudential as a money manager.  I wouldn't be the point
18    of contact in that account that would be negotiating
19    whatever transpired in terms of what their arrangement
20    was with Prudential for being -- compensating Prudential
21    for its role as a securities lending option.  That would
22    be within that area that would be set up.  I wouldn't --
23    that wouldn't be my involvement
24         Q.    In the -- if Prudential was functioning as
25    securities lending agent for a client, would there be --
```

Page 33

1                            Conner
2   would there be, would there be a contract, a securities
3   lending agreement contract?
4        A.    Oh, sure.
5        Q.    Would it have investment guidelines with it?
6        A.    You would expect investment guidelines, risk
7   guidelines.  There would be a full panoply of all the
8   things that would attend how you would invest the
9   collateral for lending the securities.  They have to go
10  hand-in-hand.
11       Q.    Were you involved at all in reviewing those
12  contracts or guidelines even if you weren't the point of
13  contact with the client?
14       A.    It would be at the early stages of setting it
15  up, and once its set up as a template, if you will, that
16  would be something to be utilized by someone on an
17  ongoing basis, client to client, over time, depending on
18  what they held.
19            That would be again somebody else that would
20  be doing that on an ongoing basis.  You may structure it
21  up, so this is how, this is what we are going to use.
22            It is the same thing as setting up a trading
23  operation.  You are going to agree on what you are going
24  to use for trade blotters, platforms, wires, monitoring
25  positions, cash flows.  Then when you're actually in the

Page 34

Conner

1        middle of doing it, there is some people whose job is

2        actually going to be involved in using those every day,

3        so I wouldn't be in that role.  For that you would

4        ultimately have a connection with the point of contact

5        between Prudential and their money management clients.

6              Those clients were involved in securities

7        loans and using Prudential as additional money manager.

8        They were also as a lending agent.

9           Q.    Do you remember how many -- leave aside

10       Prudential lending its own securities, but just when it

11       was functioning as an agent for one of its clients, do

12       you know how many of Prudential's clients engaged in

13       securities lending?

14          A.    No.  I mean, it would be a large number just

15       because Prudential's minimum account is 50 million.  They

16       have 7 billion in equities and you've got over 40 billion

17       in client bonds, 40 to 60, and a majority of that is

18       client bonds.  It is a large number, either way.  But

19       what the number was, I don't know.

20          Q.    When you say a large number, do you mean over

21       ten?  I am just trying to get a sense of what a large

22       number means to you.

23          A.    What I am saying is if you have 7 billion in

24       equity, you have over 40 million in bonds and your

Page 37

```
                              Conner
 1
 2    and involved in the discussion.  That's what I recall.
 3         Q.    Were you involved in -- I take it if you had
 4    a template for investments, that would be taken out to
 5    particular clients and shown to them and discussed with
 6    them?
 7         A.    That's an assumption on my part based on how
 8    Prudential worked.  As I said already, I wasn't involved
 9    in going out to the clients and that.  I was involved in
10    setting up how the program would work.
11              Any variation that would occur in terms of
12    how guidelines were structured as opposed to making sure
13    there was a guideline, so the template would say you have
14    guidelines A through L, whatever it is.  What those
15    guidelines were could vary between customers depending on
16    their investment objectives and how Prudential was
17    handing the overall portfolio and how that fit into their
18    broader portfolio.
19         Q.    I am trying to understand what your
20    involvement was for each client, how there ended up
21    being --
22         A.    I wouldn't be involved with each client,
23    going back to the structure, how there would be a client
24    structure.  That wasn't me.
25         Q.    When you said there was a template, was it a
```

Page 45

Conner

1

2    be some form of disclosure as to how the cash collateral

3    portfolio would be managed, and I expect the guidelines

4    would all be in writing, they would be provided the

5    client and there would be some form of acknowledged

6    signature on them.  The type of funds were massive

7    pension.  So there is going to be basically a board in

8    charge of approving investments is going to come up for

9    view and sign off on giving permission to Prudential to

10   do this, in addition to the portfolio which they are

11   already managing.

12           Prudential is not going out to run -- they

13   are not looking at that time -- I don't know if they did

14   subsequently -- they were not looking to engage in

15   managing collateral cash portfolios for clients outside

16   their investment base.  They were looking to add stock

17   lending, securities lending, to the range of investment

18   services to their client base.

19           That's part of the reason they brought me in

20   to add the use of other things, derivatives, convertible

21   securities and things like that, so they were broadening,

22   if you will, the menu they were providing to their rather

23   substantial client base.

24       Q.    Do you remember what the -- how Prudential

25   was compensated for doing securities lending with its

Page 46

1                        Conner
2    clients they were doing?
3         A.    No.
4         Q.    You know in this case this was a split.  When
5    I say this case, I meaning the contract between Sarasota
6    and Wachovia?
7         A.    Yes.
8         Q.    You know there was a split.  Do you know how
9    that was done?
10        A.    I don't know if it was uniform.  I don't
11   remember.
12        Q.    You were at Prudential for three years?
13        A.    Yes.
14        Q.    It looks as if you left and you formed Conner
15   Capital Corp. and also Thornapple Associates at the same
16   time?
17        A.    Yes.
18        Q.    Conner Capital Group lasted until 1998?
19        A.    Correct.  Conner Capital Corporation was an
20   investment manager from its inception through 1998,
21   managed portfolios on a fully discretionary basis.
22        Q.    Did Conner -- was Conner Capital Corp.
23   involved in securities lending at all?
24        A.    We did not -- we did not typically engage in
25   securities lending per se.  If there was going to be any

Page 72

1                           Conner

2        A.    No.

3        Q.    In your work at Thornapple since 1983, have

4    you had any involvement in a securities lending case?

5        A.    Yes.

6        Q.    What were those, other than this one?

7        A.    I was involved in a case in London.

8        Q.    What was that case?

9        A.    I was asked by counsel in that case not to

10   divulge the name of this case that we were working on, so

11   I agreed not to discuss the name of it.

12       Q.    Where was the case pending?

13       A.    London court.

14       Q.    In court in London?

15       A.    Yes.

16       Q.    When was it?

17       A.    It was active last year.

18       Q.    Is it still active?

19       A.    Don't know.

20       Q.    When were you engaged?

21       A.    Last year.

22       Q.    What part of the year?

23       A.    Had to be early in the year.  I don't

24   remember the exact month.

25       Q.    Were you engaged -- in that case, without

Page 73

1                              Conner

2      identifying your client per se, was your client the

3      lender or a client of a lender?  A lending agent or a

4      client of a lending agent?

5           A.    The client was not the lending agent.  The

6      client would be in a position comparable to Sarasota

7      vis-à-vis Wells Fargo, Wachovia.

8           Q.    So they lost money in a securities lending

9      program?

10          A.    Yes.

11          Q.    What was the investment at issue in the case?

12          A.    It was the overall portfolio I was managing.

13          Q.    So there was more than one investment in the

14     portfolio that lost money?

15          A.    Yes.

16          Q.    Did it involve Lehman?

17          A.    Lehman was included.

18          Q.    What other investments were included?

19          A.    I don't remember the specific investments

20     right now, but there were other investments.

21          Q.    Cigma?

22          A.    I don't recall.

23          Q.    Were there any SIBs involved in it?

24          A.    I don't recall.  It's been awhile since I

25     looked at it.

1                          Conner

2        Q.    Did you issue a report in that case?

3        A.    A report?  There was no report filed with the

4    court.

5        Q.    You submitted a report in this case.

6        A.    I did in this case.

7        Q.    I actually --

8        A.    There was no comparable report in that case.

9        Q.    What other, if any, securities cases have you

10   been involved with while at Thornapple?

11       A.    I have been involved in other cases involving

12   stock loan in connection with various types of portfolios

13   and transactions where the stock loan activity was

14   central to the case and the rules pertaining to the stock

15   loans where it's red shelf, meaning that it's hard to

16   borrow stocks and things of that sort.

17            So, it had it do with not so much a

18   securities lending program of the type run by a bank for

19   a customer as in Wachovia here in Sarasota.  It was more

20   along the lines of stock lending, stock loan by a

21   broker/dealer and in connection with its involvement with

22   the trades or the portfolios or other trades.

23       Q.    Did the cases involve securities lending

24   investment guidelines?

25       A.    Not for a collateral portfolio.  They